J-S30016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ANN M. ROGERS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT P. BAUCHWITZ | : | |
| | : | |
| Appellant | : | No. 1499 MDA 2020 |

Appeal from the Decree Entered October 29, 2020
In the Court of Common Pleas of Dauphin County Civil Division at
No(s): 1336 DR 17, 2017-CV-06699-DV

BEFORE:   BENDER, P.J.E., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:          **FILED FEBRUARY 4, 2022**

In this divorce action, Robert P. Bauchwitz (Husband) appeals *pro se* from the divorce decree entered in the Dauphin County Court of Common Pleas. The trial court adopted the divorce hearing master's recommendations, denied Husband alimony, but awarded him 60% of the marital estate. On appeal, Appellant argues the master and the trial court erred in: (1) finding he had an earning capacity of $72,000 annually; (2) not awarding him a greater share of the marital estate; (3) denying him alimony; and (4) not granting a continuance of the divorce master's hearings for additional discovery. We affirm. Furthermore, we: (1) grant Husband's application to

_____

[*] Retired Senior Judge assigned to the Superior Court.

clarify his reply brief; but (2) deny his application to supplement the original record.

## I. Divorce Complaint

On September 20, 2017, Ann M. Rogers (Wife) filed the underlying divorce complaint.[1] At that time, both parties were approximately 57 years old, had been married for 27 years, and had two adult children. Husband filed a counseled answer to the complaint, "denying that the marriage was irretrievably broken [but raising] claims for alimony, alimony pendente lite, counsel fees, costs and expenses." Trial Ct. Op., 10/9/20, at 1.[2]

The trial court appointed Cindy Conley, Esquire, to be the divorce master. She conducted a settlement conference on June 28, 2019. "A hearing was scheduled for October 17 and 18, 2019 to address all remaining issues." Trial Ct. Op., 10/9/20, at 2. On October 11th, Husband sought a continuance of the hearing to conduct more discovery. Wife filed a response, and Husband's request was denied. Both parties, then 59 years old, appeared with counsel at the October 17th hearing and gave testimony.

---

[1] The parties separated on August 28, 2017.

[2] The trial court filed two opinions: one on October 9, 2020, following both parties' objections to the master's report; and one on January 28, 2021, following Husband's notice of appeal.

## II. Divorce Master's Report

On March 13, 2020, the divorce master issued a detailed, 63-page report and recommendation, which stated the following. Wife obtained a medical degree from Cornell University in 1987, and the parties married in 1990. Wife worked as a surgeon in a New York City hospital. In June of 2006, the parties and their then-minor children relocated to Hershey, Pennsylvania so that Wife could complete a fellowship in minimally invasive bariatric surgery at the Penn State Hershey Medical Center. Wife then remained employed with the Hershey Medical Center as a bariatric surgeon, and at the time of the divorce master's hearings, was the head of that department.

Wife's 2018 gross Medicare earnings from the Hershey Medical Center was approximately $437,191.[3] Master's Report at 6. Her monthly net income from the hospital, after taxes but before deducting medical insurance costs and retirement plan contributions, was $24,700. *Id.* She had "reasonably monthly expenses of $5,467." *Id.* Wife expected "a Social Security benefit of $3,053 per month when she reaches . . . Retirement age of" 67, and will also "receive retirement benefits from her share of the marital portion of her other retirement accounts." *Id.*

---

[3] In addition, in 2018, Wife earned $11,549 income "for legal chart review, speaking honorarium, and for being a national site surveyor for bariatric surgery." Report & Recommendation of the Master, 3/13/20, at 6 (Master's Report).

Husband received an undergraduate degree in biochemistry from Harvard College in 1982, and from Cornell University, a medical degree in 1990 and a doctorate degree in 1991. He "was never licensed to practice medicine and instead, focused on research." Master's Report at 7. From the time he completed his doctorate degree until the parties moved to Hershey, Husband was employed on a full-time basis. *Id.* at 39. "According to his Social Security earnings history, the most Husband ever earned during the marriage was $90,000 in 2005." *Id.*

The divorce master found the following with regard to Husband's employment history:

> When the parties relocated to Hershey . . . in 2006, Husband continued to work in his research lab in New York . . . , but ceased that employment in 2007.
>
> After Husband relocated to Hershey, he began his own [research businesses.]
>
> Neither of Husband's businesses ever made a profit.
>
> For a brief period of time, Husband was an adjunct professor at Lebanon Valley College and earned a few thousand dollars per course.

*Id.* at 7-8 (paragraph numbers and record citations omitted).

In 2004, Husband filed a whistleblower action in the Eastern District of Pennsylvania federal court against his former employers Cornell University

Medical College, Thomas Jefferson University, and others.[4] Master's Report at 16. In 2010, this suit was "dismissed in its entirety because it was not brought within the statute of limitations." **See** Master's Report at 15-16. We note that in the proceedings below and on appeal, Husband argues his involvement in this whistleblower lawsuit hampered his ability to find employment.

"In 2010, Husband obtained a paralegal certificate from Delaware Law School and in 2016, [he] completed a certified fraud examiner certification." Master's Report at 7. At the time of the 2019 divorce master's hearings, Husband was working part-time "as a substitute teacher earning $52 gross [income] per day. In 2018, [he] had gross annual wages of $1,687." **Id.** at 8 (record citations omitted). The master's report stated, "Husband made it clear at the hearing that he does not feel he has any obligation to find full-time lucrative employment[.]" **Id.** at 47.

_____

[4] In the federal suit, Husband alleged the defendants

> misrepresented the findings of their DNA research when they applied for National Institute of Health . . . research grants and did not correct the misrepresentations on subsequent progress reports and renewal applications. These misrepresentations, [Husband] assert[ed], resulted in false claims in violation of the [False Claims Act].

**United States ex rel. Bauchwitz v. Holloman**, 671 F. Supp. 2d 674, 677 (E.D.Pa. 2009). **See also United States ex rel. Bauchwitz, v. Holloman**, 670 Fed.Appx. 762 (3d Cir. 2016).

Meanwhile, in the parties' support matter, almost two years earlier,

> [i]n December of 2017, the Dauphin County Domestic Relations Office determined Husband's gross earning capacity to be $72,000 per year as a Certified Fraud Examiner. While Husband initially requested a De Novo Review of the Order, he later withdrew his request.

Master's Report at 8 (record citations omitted). At the divorce master's hearing, when asked "whether he had provided any evidence of the job searches he had undertaken, Husband indicated that . . . documentary evidence had been presented to the domestic relations office in the support case." *Id.* at 26. Given the lack of any new evidence, the divorce master concluded the domestic relations office's prior determination "remain[ed] appropriate." *Id.*

> The divorce master also summarized Husband's health issues:

> In 2018 Husband was treated for head and neck cancer and he now undergoes periodic screenings to ensure it has not returned. Husband has also been diagnosed with osteoporosis, osteoarthritis, and degenerative dis[c] disease. Husband suffers from hemorrhoids and insomnia. Recently, Husband was diagnosed with a mediastinal mass which is being monitored for growth.

Master's Report at 4 (paragraph number and record citations omitted).

> While Husband's health has deteriorated somewhat since 2017 in that he has lifting restrictions, there was no evidence that the restriction would prohibit him from obtaining employment as a Certified Fraud Examiner, a paralegal, or employment that utilizes his medical education.

> A $72,000 gross earning capacity results in a $4,423 net after tax monthly earning capacity.

* * *

- 6 -

Husband has reasonable monthly expenses of $4,881.

Husband expects a Social Security Retirement benefit . . . of $1,162 per month when he reaches . . . Retirement age of [67.] However, when Husband reaches his full . . . Retirement age, he will have the option of claiming Social Security on Wife's earning record to receive an amount equal to half of Wife's benefit of $1,562.50. Moreover, if Husband obtains employment equal to his earning capacity, his Social Security retirement benefit should increase in amount over half of Wife's entitlement.

In addition, Husband will receive retirement benefits from his share of the marital portion of his and Wife's other retirement accounts.

*Id.* at 8-9 (paragraph numbers record citations omitted).

The divorce master also stated the following concerning any marital misconduct by either party:

Both testified that the parties would, not frequently, but from time to time, engage in physical altercations. Wife submitted photographs evidencing some of the injuries she sustained at Husband's hands[.] Wife testified credibly that sometimes she instigated the violence and sometimes Husband instigated it. Wife also admitted that she never reported the violence to the police. Husband did not deny Wife's allegations specifically[,] but testified that "pretty consistently [Wife] instigates and escalates."

Master's Report at 49 (record citations omitted).

Finally, we note the parties' marital estate was approximately $3 million. *See* Master's Report at 39. Nevertheless, the divorce master found the parties established a "middle class" and "upper middle-class" standard of living, while "putting the maximum amount into their retirement accounts[ and] living within their means[.]" *Id.* at 12, 40.

### III. Divorce Master's Recommendation — Equitable Distribution

The master divorce master considered all 13 statutory factors for equitable distribution, at 23 Pa.C.S. § 3502(a), and recommended that Husband receive 60% of the marital estate, with Wife receiving 40%. The "[m]aster concluded that the majority of the factors favored Husband[,]"

> [s]pecifically, the age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each the parties; the opportunity of each party for future acquisitions of capital assets and income; the standard of living of the parties established during the marriage; and the economic circumstances of each party at the time of the division of property[.]

Trial Ct. Op., 10/9/20, at 4.

The divorce master further found it was equitable for Husband to receive a greater share of the marital estate:

> The Divorce Master reasoned that given [Husband's] impressive education, [he] should be able to obtain employment that at least meets, if not exceeds, his earning capacity of $72,000 annually. Nevertheless, Wife's income will most likely always exceed Husband's income many times over. For this reason, the Divorce Master noted that equity demanded that Husband receive a greater portion of the marital estate.

Trial Ct. Op., 10/9/20, at 5.

Finally, the divorce master considered the parties' standard of living during the marriage. She found:

> [T]he parties had established an upper middle class standard of living[.] While in the later years of the marriage Wife's income was substantial, the parties lived well within their means while contributing the maximum to their retirement accounts. The parties lived in a nice home, took regular vacations and owned

nice, but not luxury, cars.[5] W]ith an earning capacity of $72,000[ ] annually, Husband could maintain a middle-class standard of living. . . . Wife's earning capacity would allow her to easily surpass the standard of living the parties became accustomed to during their marriage. For this reason, . . . a larger distribution to Husband was appropriate. . . .

Trial Ct. Op., 10/9/20, at 6-7.

## IV. Divorce Master's Recommendation — Alimony

The divorce master recommended that Husband **not** be awarded alimony. The master considered the 17 statutory alimony factors under 23 Pa.C.S. § 3701, and found only three favored an alimony award: (1) the parties' relative earnings and earning capacities — Wife's earnings are more than six times Husband's earning capacity; (2) the parties' standard of living during the marriage, summarized above; and (3) the parties' relative needs — while Wife "has a great deal of discretionary income," Husband would have a net monthly earning capacity of approximately $4,423, but reasonable monthly net expenses of $4,881.[6] Master's Report at 45, 47, 48; Trial Ct. Op., 10/9/20, at 8. However, these three factors "were also contained within the equitable distribution factors that favored Husband receiving a larger marital property distribution." Trial Ct. Op., 10/9/20, at 8.

_____

[5] The parties owned a 2016 Volvo and 2006 Acura. Master's Report at 9.

[6] The divorce master noted that $1,000 of Husband's current monthly expenses was medical insurance, but once he obtained full-time employment, he should be able to obtain insurance "at a greatly reduced rate." Master's Report at 48.

Thus, the divorce master further recommended that **if** alimony were to be awarded, then a 50-50 split of the marital estate, rather than 60-40, would be appropriate. Trial Ct. Op., 10/9/20, at 8. The master recommended that by awarding Husband a 60% share of the marital estate and not alimony, "Husband will be motivated to find employment close to his earning capacity and will not be discouraged from entering into another relationship, which could potentially jeopardize his income." *Id.*

The divorce master also set forth her rationale for the statutory factors that did not favor alimony for Husband. Although Husband suffered some health issues that restricted what he could lift, he is not prohibited from working. Master's Report at 45. "Given [Husband's] education, there is no reason why Husband should not be able to obtain employment with benefits," and he "has not adequately explained his failure to obtain profitable employment since" the parties moved to Hershey for Wife's career. *Id.* at 45, 46.

> Since separation, the only employment Husband has engaged in is substitute teaching, earning less than $100 a day and working very few days a week. . . . Husband made it clear at the hearing that he does not feel he has any obligation to find full-time lucrative employment[.] . . . Husband testified to a desire to revive his research lab despite the fact that his previous efforts in that regard yielded no income and only expenses. Be that as it may, Husband has sufficient education to find appropriate employment that would allow him to support himself. . . .

*Id.* at 47-48.

## V. Parties' Exceptions & Trial Court's Order

At this juncture, we note the divorce master also awarded Wife attorneys' fees of $900, to be offset with the $600 that Husband paid for the valuation of the parties' defined benefit pensions. Trial Ct. Op., 1/28/21, at 3.

Both parties filed exceptions to the divorce master's report. The trial court heard oral arguments on August 6, 2020, and issued an order on October 9th, dismissing all of Wife's exceptions and dismissing all but one of Husband's exceptions, which related to the divorce master's award of attorneys' fees to Wife without a hearing. The parties have since resolved this issue.[7]

Meanwhile, on October 28, 2020, the trial court entered the underlying divorce decree. Husband filed a timely, counseled appeal.[8]

## VI. Statement of Questions Involved

Husband presents the following issues for our review:

---

[7] The trial court's October 9, 2020, order scheduled a hearing on Wife's petition for attorneys' fees for November 10, 2020. On November 5th, however, the court cancelled the hearing, "based upon an agreement by the parties." Trial Docket, 11/23/20, at 10.

[8] The trial docket does not indicate any Pa.R.A.P. 1925(b) order by the trial court.

On December 21, 2020, Husband's counsel of record, Darren Holst, Esquire, filed an application in this Court to withdraw from representation. Attorney Holst averred that Husband had requested his withdrawal so that he could proceed *pro se*. This Court granted counsel's petition, and Appellant accordingly proceeds *pro se* in this appeal.

[1.] Did the trial court and/or the master abuse their discretion in refusing to award . . .Husband ongoing alimony and/or a larger distribution of marital assets when, at best, the record reflects that Husband can earn a maximum of $72,000 a year while Wife will continue to earn nearly $470,000 a year or more until her retirement and the distribution of [60%] of assets to . . . Husband adopted by the trial court primarily involved only retirement assets which would perpetuate a substantial economic disparity/ economic injustice between the parties from divorce until the retirement of the parties?

[2.] Did the trial court and/or the master abuse their discretion in refusing to allow Husband more time to engage in further discovery when the record reflects that Wife failed to disclose a million dollars of [marital] assets during the course of the proceedings?

[3.] Did the trial court abuse its discretion in failing to conduct a *de novo* review of evidentiary rulings and credibility assessments of the master in regard to issues that were highly relevant in determining alimony and equitable distribution?

Husband's Brief at 5-6.

## VII. Standard of Review & Relevant Law

This Court has stated:

> The trial court has broad discretion in fashioning equitable distribution awards . . . .
>
> * * *
>
> . . . In assessing the propriety of an equitable distribution scheme, our standard of review is whether the trial court, by misapplication of the law or failure to follow proper legal procedure, abused its discretion. Specifically, we measure the circumstances of the case, and the conclusions drawn by the trial court therefrom, against the provisions of [23 Pa.C.S. § 3502(a)] and the avowed objectives of the Divorce Code, that is, to effectuate economic justice between the parties and insure a fair and just determination of their property rights.

- 12 -

"Moreover, the trial court has 'the authority to divide the award as the equities presented in the particular case may require.'" Further, when a court divides the marital property, it must do so only after considering "all relevant factors," including eleven specific factors listed in the Divorce Code. 23 Pa.C.S.[ ] § 3502(a).

***Teodorski v. Teodorski***, 857 A.2d 194, 199-200 (Pa. Super. 2004) (some citations omitted).

With respect to credibility determinations,

it is within the province of the trial court to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence. We are also aware that a master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties.

**Carney v. Carney**, 167 A.3d 127, 131 (Pa. Super. 2017) (citation omitted).

Section 3502(a) of the Divorce Code[9] sets forth a non-inclusive list of factors that are relevant to the equitable division of marital property:

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

(4) The contribution by one party to the education, training or increased earning power of the other party.

---

[9] 23 Pa.C.S. §§ 3101 *et seq*.

(5) The opportunity of each party for future acquisitions of capital assets and income.

(6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

(8) The value of the property set apart to each party.

(9) The standard of living of the parties established during the marriage.

(10) The economic circumstances of each party at the time the division of property is to become effective.

(10.1) The Federal, State and local tax ramifications associated with each asset to be divided, distributed or assigned, which ramifications need not be immediate and certain.

(10.2) The expense of sale, transfer or liquidation associated with a particular asset, which expense need not be immediate and certain.

(11) Whether the party will be serving as the custodian of any dependent minor children.

23 Pa.C.S. § 3502(a)(1)-(11).

In reviewing the denial of a request for alimony,

[o]ur standard of review . . . is whether the trial court abused its discretion. We previously have explained that "[t]he purpose of alimony is not to reward one party and to punish the other, but rather to ensure that the reasonable needs of the person who is unable to support himself or herself through appropriate employment, are met." Alimony "is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as the payor's ability to pay." Moreover, "[a]limony following a divorce is a secondary remedy and is available only where economic justice and the reasonable needs of the parties cannot be achieved by way of an

- 14 -

equitable distribution award and development of an appropriate employable skill."

*Teodorski*, 857 A.2d at 200 (citation and emphasis omitted).

Section 3701(b) provides that in determining the necessity, nature, amount, and duration of alimony,

the court shall consider all relevant factors, including:

(1) The relative earnings and earning capacities of the parties.

(2) The ages and the physical, mental and emotional conditions of the parties.

(3) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(4) The expectancies and inheritances of the parties.

(5) The duration of the marriage.

(6) The contribution by one party to the education, training or increased earning power of the other party.

(7) The extent to which the earning power, expenses or financial obligations of a party will be affected by reason of serving as the custodian of a minor child.

(8) The standard of living of the parties established during the marriage.

(9) The relative education of the parties and the time necessary to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment.

(10) The relative assets and liabilities of the parties.

(11) The property brought to the marriage by either party.

(12) The contribution of a spouse as homemaker.

(13) The relative needs of the parties.

(14) The marital misconduct of either of the parties during the marriage. . . .

(15) The Federal, State and local tax ramifications of the alimony award.

(16) Whether the party seeking alimony lacks sufficient property, including, but not limited to, property distributed under Chapter 35 (relating to property rights), to provide for the party's reasonable needs.

(17) Whether the party seeking alimony is incapable of self-support through appropriate employment.

23 Pa.C.S. § 3701(b)(1)-(17).

## VIII. Husband's Issues: Equitable Distribution & Alimony

In Husband's first issue, he argues both the divorce master and trial court erred in not awarding him a greater share of the marital estate, and in denying his request for alimony. Preliminarily, we observe that portions of Husband's *pro se* brief, 68 pages in length, lack clarity and sound legal argument. We emphasize that Husband does not acknowledge the master's and trial court's extensive discussion of the statutory factors for equitable distribution and alimony. As we discuss ***infra***, some of his rationales are hard to follow, or veer into irrelevant topics. Nevertheless, we glean from his brief the following chief complaints.

First, Husband appears to argue the divorce master and trial court erred in considering the parties had a frugal lifestyle during the marriage, while acknowledging the master's and court's statements that the parties had an "upper middle class" or "middle class" standard of living. Husband's Brief at

18-19 (divorce master and trial court made "erroneous and incomplete descriptions of the couple's lifestyle"). Husband cites the United States Census Bureau to argue he and Wife "were in the top 5% of U.S. incomes," and that following this divorce, Wife "alone would remain in the top few percent of American income earners." *Id.* at 18-19. Husband contends that a couple's "frugality in one area does not preclude economic advantage in another," and thus, how a married couple spends their money — "whether [on] houses, businesses, cars, vacation, or investments [—] does not impact an overall consideration of their standard of living." *Id.*

Next, Husband challenges, on several bases, the divorce master and trial court's finding that he has an earning capacity of $72,000. As stated above, in response to whether he had any evidence of his job searches, Husband stated he previously presented documentary evidence to the domestic relations office in the support case. Master's Report at 26. Relatedly, Husband initially sought, but then withdrew, *de novo* review of the domestic relations office's determination of his earning capacity. *Id.* at 25.

Husband now argues the sole document cited in the domestic relations office's December 26, 2017, support order stated "the average starting income . . . of a person holding a fraud examiner certification" was $44,000 annually. Husband's Brief at 21. Husband also now claims he did not agree with his counsel's decision to withdraw his request for *de novo* review of the domestic relations office's determination. *Id.* at 22.

We conclude Husband's challenges to the domestic relations office's determinations are both waived and misplaced. As both the divorce master and trial court pointed out, any challenge to the domestic relations office's determination should have been brought in that proceeding. **See** Trial Ct. Op., 10/9/20, at 11; Master's Report at 26. Furthermore, Husband does not deny that instead of presenting any new evidence pertaining to his job searches or earning capacity, he merely referred to documents submitted two years earlier to the domestic relations office. Husband offers no explanation why he did not present any evidence to the divorce master, for her independent recommendations to the trial court as to equitable distribution and alimony. Accordingly, any argument that the master should have considered other evidence is waived. **See** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Next, in challenging the $72,000 earning capacity figure, Husband cites his: "employability [following his] involvement in [the whistleblower] suit against a former employer, [a] decade without earnings history, his lack of experience of high-paying jobs outside of his field, his advanced age, and his needs for accommodations for medical limitations on work." Husband's Brief at 23-24 (emphasis omitted). Husband denies that his Harvard medical education "would be determinative of employment," arguing, for example, that he lacks the "clinical medical knowledge . . . required to review charts as

a paralegal" and "does not have the financial training or background to work as an insurance fraud examiner." *Id.* at 31, 33-34. Finally, Husband challenges the master's and trial court's "theory that [he] lacked" motivation to obtain full-time employment. *Id.* at 38. He concludes the trial court's findings lack support in the record. We disagree.

While Husband extensively discusses employment in or pertaining to the medical field, he wholly ignores that he pursued and obtained a paralegal certificate in 2010 and a certified fraud examiner certificate in 2016. *See* Master's Report at 7. At the time of the hearings, Husband had possessed these credentials for, respectively, approximately nine and three years. The trial court found "there was no medical evidence offered to suggest Husband was prohibited from obtaining employment as a Certified Fraud Examiner, a paralegal, or employment that utilizes his medical education." Trial Ct. Op., 10/9/20, at 11. Husband does not refute this rationale. For all the foregoing reasons, we conclude no relief is due on Husband's claims that he was assessed an improper earning capacity.

Next, Husband challenges his award of 60% of the marital estate, which he characterizes as "an additional 10% of marital assets," with a value of $176,127. Husband's Brief at 41, 42 (footnote omitted). Husband avers that of this amount, "$154,341 would be in taxable retirement funds if taken before retirement age[.]" *Id.* at 42-43. He then contends, without further explanation for the following figures, that "[t]he master did not show any tax

consequences for the almost 88% of retirement funds which made up the recommended asset distribution[.]" *See id.* at 43. Husband also calculates that his "10% supplemental marital assets . . . when amortized from the date of the master's report to Husband's 67th birthday . . . , was estimated to provide [him] $1948/month in net income." *Id.* at 44 (emphasis omitted). He avers this amount, in addition to the anticipated monthly income he was expected to earn — $4,512[10] — would not be sufficient to meet his "over $7000 of **actual** expenses presented to the court." *Id.* at 44-45.

Relying on these same figures, Husband avers the trial court erred in denying him alimony. He calculates that if he were awarded $3,000 monthly, alimony would be greater than the "$1948/month from [the] 10% additional marital assets (of which almost 88% are in retirement funds)." Husband's Brief at 48 (record citation omitted). Husband then states, again without further explanation or support, that if he were "given 55% of the marital assets and $3000/month alimony, then when the tax implications were considered, the total after-tax income would be $341,850, or 2.0 fold more than" the award of 60% of the marital estate alone. *See id.* at 49 (emphasis omitted). No relief is due.

---

[10] Husband asserts, without further explanation or support, that if he earned a gross annual income of $72,000, his "net income" would be "$54,144/year or $4512/month." *See* Husband's Brief at 44 (emphasis omitted).

First, Husband ignores that the divorce master recommended, and the court found, that his reasonable monthly expenses were $4,881. *See* Master's Report at 8. Husband does not challenge this finding on appeal, and offers no explanation to support his inflated $7,000 figure.

Husband also fails to address the marital estate and his 60% share as a whole, instead focusing solely on a portion thereof, $176,127, and arguing why that isolated amount is insufficient. Both the divorce master and trial court extensively considered the parties' differing incomes and concluded that Husband was entitled to more than 50-50 split. Husband also ignores that the trial court awarded him 60% of an almost $3 million marital estate. To this end, we further observe Husband provides no explanation for the source of his $176,127 figure. His claims merit no relief.

Finally, in his claim for alimony, Husband points out alimony is "modifiable[;]" for example, if he became "very wealthy, Wife might stop paying alimony." Husband's Brief at 49. . Alternatively, if Husband broke "his back . . . from his severe osteoporosis," then alimony would provide "a safety net . . . to present the complete and certain demise of his standard of living." *Id.* Husband's reliance on hypothetical circumstances is meritless. Instead, alimony is properly awarded on a party's reasonable needs and — as Husband wholly ignores — is a "secondary remedy and . . . available only where economic justice and" one party's reasonable needs cannot be met through "an equitable distribution award **and** development of an appropriate

employable skill." **See Teodorski**, 857 A.2d at 200 (emphasis added). As stated above, Husband wholly fails to address the master's and trial court's weighing of the Section 3701(b) factors. For all the foregoing reasons, we conclude no relief is due.

At this juncture we review Appellant's third issue on appeal — that the trial court abused its discretion in not conducting "a *de novo* review of [the divorce master's] evidentiary rulings and credibility assessments[.]" Husband's Brief at 57. He maintains that "Wife persisted in not disclosing almost $1 million in retirement[,] pension and other funds." **Id.** (discussed further **infra**).

Throughout her report, the divorce master set forth credibility determinations with respect to both parties, regarding particular issues. On appeal, Husband challenges the master's statements that "Husband testified that he oversaw the parties' investments to a very detailed and exhaustive knowledge of the parties' finances[,]" and that "by his own admission[,] Husband was largely in charge of the parties' finances[.]" Husband's Brief at 58 (emphases omitted).

No relief is due. We reiterate that a master's report and recommendation "is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." **Carney**, 167 A.3d at 131. The points raised by Husband relate to one isolated issue —

- 22 -

the extent of Husband's knowledge of Wife's finances — the weight of which would not require reversal of the master's and trial court's extensive findings into the other matters presented in this case.

## IX. Denial of Continuance Request

In Husband's second issue, he avers the discovery master and trial court abused their discretion in not granting his request for a continuance of the October 17, 2019, hearing and for additional time to conduct discovery.

By way of context, we note the following. Following the divorce master's June 28, 2019, settlement conference, additional hearings were scheduled for October 17 and 18, 2019, to address all remaining issues. Trial Ct. Op., 10/9/20, at 2. On October 11th, six days before the scheduled hearing, Husband filed a request for a continuance, "again" arguing Wife "failed to disclose all of her retirement assets and . . . was attempting to hide marital assets." Master's Report at 33. Wife filed a response, which: (1) "again" acknowledged "that the failure to list all of the retirement accounts was" due to her counsel's mistaken belief "that 'the TIAA retirement account and the Empower account were the same asset[;]'" and (2) explained this mistake was "discussed and resolved between the parties' attorneys[ and] was not meant to fraudulently hide marital assets." *Id.* at 33-34. Wife further argued Husband was causing unnecessary delay:

> This divorce action has been pending [for 25 months]. Husband has sought the advice of at least five . . . different attorneys and presumably resumed sound legal advice. Husband conducted formal discovery and had the opportunity to request information

from Wife at the divorce master's preliminary conference and settlement conference. Husband should not be able to use a last-minute request for additional and unnecessary and irrelevant[ ] information as an excuse to further delay this proceeding.

**See** Master's Report at 35, citing Wife's Response. The master further explained:

At the settlement conference, Husband requested . . . copies of the Autopsy and Toxicology Reports of Wife's Father[, arguing] these reports are necessary to prove that Wife committed marital fault. [T]he master advised that she did not find them relevant to that issue[.]

**Id.** at 35 n.2. The master denied Husband's request for a continuance and the hearing proceeded as scheduled on October 17, 2019.

On appeal, Husband reiterates his claim that Wife did not disclose numerous assets, including almost $1 million in retirement assets. Husband's Brief at 61. This argument ignores the above discussion; Husband does not refute the master's summary that the parties **resolved** the issues of the alleged missing retirement asset. He is entitled to no relief.

Furthermore, Husband argues on appeal that Wife failed to provide "unredacted, unaltered and complete . . . Capital One and Northwest Bank" bank and credit card account statements for 2017 and 2018. Husband's Brief at 62, 64.

The divorce master likewise aptly addressed this claim, pointing out that the parties separated on August 28, 2017, and Wife was not directed to provide bank statements dated after separation. Master's Report at 34. Nevertheless, in her answer to Husband's continuance request, Wife indicated

that she "voluntarily provided additional statements for the accounts [post-dating] September 2017, but redacted some of the detail . . . because she did not want to provide details regarding her post-separation banking to Husband." *Id.* Husband offers no argument why the divorce master erred nor why he is entitled to Wife's post-separation financial information.

### X. Husband's Applications to Supplement & Clarify Record

During this appeal, Appellant filed, on September 19, 2021, an "Application of Clarification" regarding his reply brief. He points out that page 22 of his reply brief states, "**This** was not granted by the trial court." Appellant's Application of Clarification, 9/19/21, at 1 (emphasis added). Appellant now wishes to clarify that the word, "This," refers to "special relief to sell the home." *Id.* at 2. We grant this application and incorporate Appellant's above explanation into our review.

That same day, Appellant also filed an "Application to Supplement the Original Record," averring that in footnote 17 of his reply brief, he "quoted from a power of attorney (POA)." Husband's Application to Supplement Original Record, 9/19/21. We note that in this POA, executed October 31, 2019 (after the divorce master's hearings), Husband granted Wife power of attorney to list and sell the marital residence. *See id.* Exh. A. Husband argues that although the subsequent revocation of this POA appears in the certified record, the POA itself does not.

To the extent Appellant desires this Court to consider the document in our review, we shall. However, we deny his application to formally supplement the trial record with an unauthenticated photocopy of this document.

## XI. Conclusion

In sum, we affirm the order of the trial court awarding Husband 60% of the marital estate and denying his request for alimony. We grant his application for clarification and deny his application to supplement the original record.

Order affirmed. Husband's Application for Clarification granted. Husband's Application to Supplement the Original Record denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/04/2022